BLANDING ET AL. *v.* DuBOSE ET AL.

No. 81–325.   Decided January 11, 1982

PER CURIAM.

Appellants, citizens of Sumter County, S. C., have taken an appeal from a summary judgment entered against them on February 17, 1981, by the United States District Court for the District of South Carolina. The three-judge District Court concluded that Sumter County in June 1979 had made a preclearance submission under § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c, when it wrote the United States Attorney General informing him that a referendum had approved at-large County Council elections. Because the Attorney General failed to object within 60 days to the claimed preclearance submission, the District Court permitted Sumter County to proceed with at-large elections for its County Council. We hold that the county's June 1979 letter was a reconsideration request, not a preclearance submission, and reverse.

I

Section 5 of the Voting Rights Act[1] provides that when a covered political subdivision enacts a voting procedure different from that in effect on November 1, 1964, the political subdivision must either seek a declaratory judgment in the United States District Court for the District of Columbia approving the procedure or submit it to the United States Attorney General for preclearance. If the procedure is submitted to the Attorney General and he does not interpose an objection to the preclearance submission within 60 days, the procedure may be enforced.

---

[1] Section 5, as amended, reads in pertinent part as follows:

"Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, . . . such State

On November 1, 1964, Sumter County was governed by its South Carolina General Assembly delegation acting through a County Board of Supervisors. In 1967, the General Assembly enacted a local bill that established a new form of government for Sumter County, namely, a seven-member County Commission elected at-large. See 1967 S. C. Acts, No. 371. Although this change required preclearance under § 5 of the Voting Rights Act, no steps were taken to obtain preclearance and at-large elections were held in 1968, 1970, 1972, and 1974.

In 1975, the General Assembly passed, and the Governor approved, the State's Home Rule Act, 1975 S. C. Acts, No. 283, codified as S. C. Code § 4-9-10 *et seq.* (1976 and Supp. 1980). The Act permitted a South Carolina county to hold a referendum to select a form of local government and to choose between at-large and single-member district elections. § 4-9-10. The Act specifically provided that if Sumter County did not hold a referendum, it would be assigned, effective July 1, 1976, the council-administrator form of government with council members elected at-large. § 4-9-10(b).

---

or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, . . . and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission. . . . Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 and any appeal shall lie to the Supreme Court."

The Home Rule Act was submitted to the Attorney General of the United States for preclearance. The Attorney General[2] did not interpose an objection to the Act, as such, but he indicated that the outcomes of Home Rule Act referenda or assignments of forms of government under the Act would be subject to preclearance.

Sumter County chose not to hold a referendum. Accordingly, it was assigned the council-administrator form of government with at-large elections. The County Council passed a resolution and ordinance adopting that form of government and method of election.

On August 13, 1976, the County Administrator submitted the Sumter County Home Rule Ordinance and the 1967 Act to the Attorney General for preclearance. On December 3, after having obtained necessary additional information, see 28 CFR § 51.18 (1980), the Attorney General made a timely objection to the at-large method of election of the Council. He interposed no objection to the council-administrator form of government.

The county requested the Attorney General to reconsider his objection to at-large elections, see § 51.21(b), and the county and the Attorney General continued to correspond during 1977 and 1978. In early 1978, the county asked whether the Attorney General would withdraw his objection if a county referendum endorsed the at-large method of election. On April 28 of that year, the Attorney General declined to withdraw the objection and advised the county that a favorable referendum result, by itself, would not cause him to change his mind.

A Council election was scheduled for June 13, 1978. After the Attorney General refused to withdraw his objection, private parties and the United States brought separate federal suits to prevent elections under the at-large system. The

---

[2] The Attorney General acted through the Assistant Attorney General, Civil Rights Division.

two suits were consolidated. A single judge issued a temporary restraining order, and on June 21, 1978, a three-judge District Court permanently enjoined County Council elections until the requirements of the Voting Rights Act were fulfilled.

In November 1978, Sumter County went ahead with its referendum in which voters were asked whether they preferred that Council members be elected at-large or from single-member districts. The majority endorsed the at-large method. Because Council members already were being elected under the at-large system, the county did not enact any resolution or ordinance to adopt the results of the referendum.

Then came the critical exchange of correspondence. On June 4, 1979, the Attorney General received a letter, dated June 1, from the county advising him of the referendum results. The letter expressed doubt as to whether it was a new preclearance submission of the at-large method, see 28 CFR § 51.2(c) (1980), or a request that the Attorney General reconsider his earlier objection to at-large elections, see § 51.21.[3] Subsequently, on July 23, a conference was held in Washington, D. C., between county officials and representatives of the Department of Justice. See § 51.23. Fifteen days later, see § 51.24,[4] on August 7, the Attorney General,

---

[3] The letter states: "We are uncertain as to whether this submission should be termed a 'new submission,' or a 'request' for reconsideration of the Attorney General's objection to the County's original submission." 1 Record, Defendants' Exhibit 7, p. 3, attached to County Defendants' Motion for Summary Judgment filed with the District Court on Jan. 25, 1980.

[4] Section 51.24 reads:

"An objection shall be withdrawn if the submitting authority can produce information not previously available to it which satisfies the Attorney General that the change does not have a racially discriminatory purpose or effect. The Attorney General shall notify the submitting authority within 60 days of the request for reconsideration (provided that the Attorney General shall have at least 15 days following any conference that is held in which to decide) of his decision to continue or withdraw an objection, giving

referring to the county's letter as a "request for reconsideration," refused to withdraw the objection to at-large elections, but advised the county that the Department of Justice had not yet completed its review. On September 27, the Attorney General for a second time refused to withdraw his objection. See § 51.25.[5]

Thereafter, the defendant-appellees moved the District Court for summary judgment. They contended that the June letter was a preclearance submission, not a request for reconsideration. Section 5, the appellees noted, requires the Attorney General to object within 60 days of a preclearance submission. They asserted that, since the Attorney General did not interpose an objection by August 3, the county was free under § 5 to proceed with at-large elections.

A three-judge District Court was again convened. It agreed with appellees. 509 F. Supp. 1334 (1981). Referring to § 5 of the Voting Rights Act, the court observed that the 1978 referendum approved a method of electing county officials different from that in effect on November 1, 1964. The letter received June 4, 1979, according to the District Court, was the required preclearance submission. Rejecting the Attorney General's argument that the letter was a request for reconsideration of his timely 1976 objection to at-large elections, the District Court declared: "This Court will not be a party to the [Attorney General's] effort to excuse his

---

the reasons for his decision. A copy of the notification shall be sent to any party that has commented on the submission or has requested notice of the Attorney General's action thereon."

[5] The District Court in its opinion, 509 F. Supp. 1334 (1981), omitted mention of the August 7 letter, which is Defendants' Exhibit 8 attached to the motion for summary judgment. The court stated that the Attorney General did not take action following the July 23 conference until he refused to withdraw his objection on September 27. 509 F. Supp., at 1336. In this respect, the decision of the District Court was clearly erroneous.

failure to act by mislabeling a submission for preclearance as a 'request for reconsideration.'"[6]    509 F. Supp., at 1336.

## II

We conclude that the District Court, not the Attorney General, mislabeled the June 1979 letter.    The court ruled that that letter was a preclearance submission because the referendum approved a method of selecting officials different from that in effect on November 1, 1964.    But the change to at-large County Council elections already had been submitted to the Attorney General for preclearance.    The 1978 referendum merely approved the pre-existing at-large method—the very method to which the Attorney General earlier had made a timely objection.    Because the referendum did no more than endorse a method of election that previously had been submitted to the Attorney General and that was the subject of an outstanding objection, the June letter did not amount to a new preclearance submission.

Indeed, the June letter fell squarely within the definition of a reconsideration request.    The applicable regulation provides that the Attorney General will reconsider his objection upon a request by a submitting authority "to present further substantiating or explanatory information which was not previously available to the submitting authority."    28 CFR § 51.21(b) (1980).    The results of the referendum constituted further explanatory information concerning at-large elections which the county asked the Attorney General to consider.

---

[6] Once it concluded that the June letter was a preclearance submission, the District Court found that the Attorney General's actions were untimely.    But it can hardly be said that the Attorney General failed to act in response to the June letter.    We note again that Department of Justice officials held a conference with Sumter County officials on July 23, that the Attorney General refused to withdraw his objection on August 7, within 15 days of that conference, and that the Attorney General once more, on September 27, refused to withdraw his objection.

The June letter thus was nothing more than a request that the Attorney General reconsider his earlier objection to at-large County Council elections in light of the referendum results.

The District Court put forward several reasons why, in its view, the June letter was not a reconsideration request. None of them persuades us. First, the District Court pointed out that the county already had made one reconsideration request. But the regulations do not limit a political subdivision to a single request for reconsideration. Second, the court relied upon 28 CFR § 51.21(b) (1980), which requires that a reconsideration request be made within 10 days of the Attorney General's objection. The Attorney General, however, follows the laudable practice of accepting reconsideration requests even though they are untimely, thus considering possibly important information that was not available within 10 days of the original objection. See also § 51.25 (permitting the Attorney General to reconsider his objection on his own motion). In any event, the mere fact that a reconsideration request is untimely does not convert it into a preclearance submission. Third, the court also cited § 51.21(b) for the proposition that a reconsideration request must be based on information not previously available. That requirement poses no obstacle to considering the June letter a reconsideration request, because the outcome of the referendum constituted information not previously available to Sumter County authorities. And, just as a reconsideration request does not become a preclearance submission merely by being untimely, so a reconsideration request does not become a preclearance submission simply by being repetitive.

Not only does the District Court decision mischaracterize the June letter, but its decision also has undesirable results. Under that court's ruling, a political subdivision could recommence the 60-day period at will by readopting the contested voting procedure. In addition, the Attorney General would be forced to interpose redundant objections to the same

change in voting laws. For these reasons also, we refuse to accept the District Court's interpretation of § 5.

Finally, we have frequently stated that courts should grant deference to the interpretation given statutes and regulations by the officials charged with their administration. See, *e. g.*, *Ford Motor Credit Co.* v. *Milhollin*, 444 U. S. 555 (1980); *United States* v. *Sheffield Board of Comm'rs*, 435 U. S. 110, 131 (1978); *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965). In this case, the Attorney General employed reasonable definitions of a preclearance submission and of a reconsideration request when he treated the June letter as in the latter category. Indeed, the Attorney General followed the more sensible course.[7]

The judgment of the District Court is

*Reversed.*

THE CHIEF JUSTICE concurs in the judgment.

JUSTICE REHNQUIST, with whom JUSTICE POWELL joins, concurring.

The *per curiam* correctly concludes that the June 1, 1979, letter from Sumter County was a request for reconsideration, not a preclearance submission. Therefore, I concur in the *per curiam*'s reasoning and conclusion. I concur reluctantly, however, for the record in this case illustrates what I view as the unreasonably burdensome and unrealistic control which the Federal Government routinely exercises over state and local governments under the Voting Rights Act.

---

[7] Before the District Court, there was a dispute whether the June letter was accompanied by a multipage document supplying, *inter alia*, the information required by 28 CFR § 51.10 (1980), or whether that document was first presented to the Department of Justice at the July 23 conference. If the document was not presented until July 23, the Attorney General's August 7 letter might not have been untimely even if the June letter were a preclearance submission. See §§ 51.3(b) and 51.18(a). See also *City of Rome* v. *United States*, 446 U. S. 156, 171 (1980). Because we hold that the June letter was not a preclearance submission, we need not address this issue.

The record recounts a 5-year effort by Sumter County to obtain the approval of several United States Assistant Attorneys General for an election method adopted by the South Carolina General Assembly. This effort included occasional correspondence with high-level attorneys in the Civil Rights Division of the Department of Justice, and, apparently, more frequent contact with low-level attorneys who requested information about plans, statistics, histories, names, places, and related facts. Although such communications are not unusual in dealings with today's federal bureaucracy, the record portrays a particularly frustrating effort to please a distant authority with veto power over the decisions of local officials. For example, an October 31, 1977, letter from appellees to an Assistant Attorney General explains the county's legal inability under state law to comply with various "suggestions" from the Department of Justice. The letter concludes:

> "This leaves us in a dilemma. The [County] Council doesn't wish to be in the position of seeming to pay no attention to your suggestion that the form of election should properly be changed; or to seem to be disregarding your suggestions. On the other hand, the County's Council is advised that it has inadequate legal power to act under South Carolina law in the manner you seem to be suggesting. . . . Perhaps you can suggest something to us which would help us to resolve our difficulties which have us disturbed, perplexed, and confounded." 1 Record, Defendants' Exhibit 20, pp. 2–3, attached to County Defendants' Motion for Summary Judgment, filed Jan. 25, 1980.

Today's decision, of course, will only reopen the dispute and again place the county at the mercy of attorneys in the Justice Department. There seems to be something inherently unsatisfactory about a system which places such discretion-

ary authority in the hands of a few unelected federal officials who are wholly detached from the realities of the locality and the preferences of the local electorate. Nonetheless, it is the system which Congress has established, and I therefore concur in the judgment.